**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

TM SOLUTIONS USA LLC,

    Plaintiff,

vs.

LATAM AIRLINES GROUP S.A. INC.,

    Defendant.
_____/

CASE NO.

CLASS ACTION

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT**

Plaintiff TM Solutions USA LLC ("TM Solutions"), individually and on behalf of all others similarly situated, by and through its counsel, sues Defendant LATAM Airlines Group S.A. Inc. ("LATAM"), for damages and equitable relief and, in support thereof, alleges the following:

**INTRODUCTION**

Traveling is often a pleasurable experience, even when it is done for work. The change in scenery from the regular routine of the workplace can add a little motivation to the sometimes-monotonous, long workdays. The logistics of travelling are, however, never simple. Early arrivals at airports, check-ins, luggage-size issues, luggage-misplacement problems, long security check lines, delays, and the fear of every traveler: cancellations. Now, cancellations are bad enough when they occur due to unforeseen reasons like weather, malfunctions, or a global pandemic. Consumers suffer, but most understand that there are circumstances beyond an airline's control. This sort of cancellations is not the subject of this lawsuit. This lawsuit is about an airline intentionally, and as a matter of policy, cancelling tickets for flights that consumers already paid for, without their consent, in order to resell them and enrich itself—all at the expense of stranded consumers.

## PARTIES

1. TM Solutions is a limited liability company formed under the laws of Florida and does business in Miami, Florida. Pedro Egusquiza ("Egusquiza") is the owner and managing member of TM Solutions.

2. LATAM is a foreign corporation, registered to do business in Florida and was, at all relevant times, doing business in Miami, Florida. LATAM is an international commercial air carrier that operates under the brand name "LATAM Airlines."

3. LATAM has extensive operations in the United States, particularly in Florida. For example, in 2015, LATAM inaugurated a 98,242 sq. ft maintenance facility at Miami International Airport ("MIA").[1] LATAM is considered the busiest airline for cargo and the third busiest for passengers at MIA.[2] Besides Florida, LATAM also operates in California, Massachusetts, New York, and Washington, D.C.

## JURISDICTION AND VENUE

4. This is a class action lawsuit for damages within the jurisdiction of this Court.

5. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331 because some of Plaintiff's claims are brought under the Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention" or "Convention"). Specifically, this Court has jurisdiction under Art. 33(1) of the Montreal Convention.

6. This Court has personal jurisdiction over LATAM because it continuously and systematically does business in Florida and avails itself of Florida's market. This Court also has personal jurisdiction pursuant to Florida's long-arm statute, § 48.193, Fla. Stat.

---

[1] *See* https://www.miamiherald.com/news/business/article50193715.html (last visited 04/10/2020).
[2] *Id.*

7.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district. Moreover, LATAM's wrongful acts in this district have impacted the general public of this district, and the ends of justice require that parties residing in other districts be brought before this Court.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

8.     TM Solutions is a company dedicated, principally, to the wholesale of fresh produce in the United States and other international markets.

9.     On or about February 13, 2020, in his capacity as manager member and owner of TM Solutions, Egusquiza had to travel to Miami, Florida, for business meetings with one of TM Solutions' main partners in the United States.

10.    Due to the nature of the meetings, Egusquiza called Andres Guerrero ("Guerrero"), a food industry professional working for a TM Solutions affiliate in Lima, Peru, to travel with him for the meetings. Egusquiza requested his assistant, Talia Peschiera ("Peschiera"), to purchase flights on the route LIM[3]-MIA-LIM for both of them.

11.    On or about February 14, 2020, Peschiera proceeded to purchase Egusquiza and Guerrero's flights. Peschiera was supposed to purchase flights departing from LIM on the early hours of February 19, 2020 and returning from MIA on the early hours of February 21, 2020. However, Peschiera inadvertently purchased the inbound flights for February 18, 2020, at 12:15AM rather than February 19, 2020, at a similar time.

12.    TM Solutions paid $2,280 for Egusquiza and Guerrero's roundtrip tickets.

13.    Realizing the error, Peschiera called the customer service center of BudgetAir.com, ("BudgetAir"), an online website LATAM uses to sell flights. BudgetAir agents told Peschiera

---

[3] Jorge Chávez International Airport in Lima, Peru.

that: (1) replacement tickets for the mistakenly purchased inbound flights were around $1,800 and (2) that she should call LATAM directly to resolve the problem.

14. Peschiera, as instructed, called LATAM, which in turn told her to call BudgetAir; that BudgetAir was the one that had to resolve the problem.

15. Given the useless back-and-forth from one entity to the other, and after multiple calls, Peschiera proceeded to look for flights on the internet to replace the mistakenly purchased LIM-MIA flights.

16. Peschiera was able to find substitute LIM-MIA flights for Egusquiza and Guerrero in American Airlines for $420 each. Given the drastic difference between changing flights with LATAM ($1,800) and buying new one-way inbound flights, Peschiera, in consultation with Egusquiza, proceeded to purchase the less expensive replacement flights—as most reasonable consumers would.

17. Importantly, Peschiera, in her call with LATAM, told the customer service agent what she was going to do, i.e., that given the difference in flight prices, she would purchase new one-way inbound flights in the open market for Egusquiza and Guerrero.

18. At no point was Peschiera told that this would be a problem, or that it would have any impact on the existing reservation.

19. At all times, Peschiera told both LATAM and its agents at BudgetAir that Egusquiza and Guerrero were not going to use the inbound LIM-MIA flights.

20. On February 20, 2020, Peschiera attempted to complete the check-in for Egusquiza and Guerrero's outbound flight in LATAM's website. To her surprise, there was no available reservation with her original LATAM reservation code.

21. Peschiera called BudgetAir, which in turn told her to call LATAM, which in turn told her to call BudgetAir again. Both LATAM and BudgetAir told Peschiera that it is the policy of LATAM to cancel complete reservations (the entire roundtrip) once a passenger does not board his inbound flight (this is the so called "no-show" policy). Peschiera requested to speak with LATAM supervisors but they would not speak with her.

22. Frustrated, and with no other options, Peschiera told Egusquiza about the LATAM fiasco. Egusquiza then, stranded in Miami, proceeded to search for MIA-LIM flights for him and Guerrero since both had to return to Lima that same day or in the early hours of February 21, 2020.

23. Unfortunately, there were no direct MIA-LIM flights. The only option Egusquiza could find was a MIA-BOG[4] flight in Avianca on February 21, 2020, at 12:45AM and then an additional flight from Bogotá to Lima at 06:25AM. The total cost for these flights was $1,526.

24. At no point did LATAM ask TM Solutions, or any of its agents (Peschiera, Egusquiza, or Guerrero), for consent to cancel the already paid-for MIA-LIM return flights.

25. At no point did TM Solutions, or any of its agents tell LATAM that it could resell the return flights that had already been paid for by TM Solutions.

26. It would be very inexpensive and simple for LATAM to request their consumers' consent to resell or cancel flights that consumers will not use, but LATAM, as a matter of policy, does not obtain this consent because it would deprive LATAM of a rather profitable resale scheme under its current "no-show" policy whereby LATAM nets the price of a single flight twice, enlarging its already formidable bottom line.[5]

---

[4] El Dorado International Airport in Bogotá, Colombia.
[5] For example, in 2018, LATAM reported $9.8 billion in revenue, $758 million in operating income, and $213 million in net income. In 2019, LATAM had $190 million of operating income. See http://www.latamairlinesgroup.net/results-center (last visited 04/13/2020).

## **CLASS ACTION ALLEGATIONS**

27. Plaintiff re-alleges and incorporates by reference all the allegations contained in paragraphs 1 through 26.

28. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(b)(2), (3), and (c)(4).

29. Plaintiff seeks certification of the following *Multistate Class*:

**All residents of the States of Florida, California, Massachusetts, New York, and Washington, D.C. who purchased a roundtrip ticket with LATAM and whose flights were cancelled by LATAM without their consent within the applicable limitations period.**

30. Plaintiff also seeks certification of the following *Florida Subclass*:

**All residents of the State of Florida who purchased a roundtrip ticket with LATAM and whose flights were cancelled by LATAM without their consent within the applicable limitations period.**

31. Excluded from these classes are LATAM, its respective affiliates, subsidiaries, agents, board members, directors, officers, employees, and/or their family members.

*Numerosity*

32. This class action satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1). The classes defined in this Class Action Complaint are sufficiently numerous that separate joinder of each member is impracticable as the classes will include thousands of members.

*Commonality*

33. This class action satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2), as the claims raise questions of law and fact common to each member of the classes, which include, without limitation:

  (a) Whether LATAM's "no-show" policy unjustly enriches LATAM.

  (b) Whether LATAM's "no-show" policy makes LATAM liable to Class Members under the Montreal Convention.

(c) Whether LATAM breached its contracts with Class Members when it did not provide flights for which it already received payment.

(d) Whether LATAM's "no-show" policy is unconscionable.

(e) Whether LATAM should be required to obtain consent before cancelling the Class Members' already purchased flights.

(f) Whether LATAM's "no-show" policy is unfair and/or deceptive.

### *Typicality*

34. This class action satisfies the typicality requirement of Fed. R. Civ. P. 23(a)(3), as the claims made by the named plaintiff are similar to those of the Class Members. For example, most putative class members were stranded in airports due to LATAM's unilateral cancellations, had to purchase replacement flights, and spend additional costs that they would not have otherwise.

### *Adequacy*

35. This class action satisfies the adequacy requirement of Fed. R. Civ. P. 23(a)(4) because TM Solutions, through its agents, will fairly and adequately protect and represent the interests of each class member, since it has suffered the same wrongs as the Class Members.

36. TM Solutions and its agents are well aware of their responsibilities as class representatives and have retained Ayala Law, P.A. and Garcia-Menocal, Irias & Pastori LLP, who are experienced in complex litigation and have the necessary resources to meet the costs and requirements of a case of this nature.

### *Predominance*

37. The prerequisites for maintaining a class action under Fed. R. Civ. P. 23(b)(3) also exist because there are questions of law or fact common to all class members that predominate over any questions affecting only individual members. These questions include, without limitation:

(a) Whether LATAM's "no-show" policy unjustly enriches LATAM.

(b) Whether LATAM's "no-show" policy makes LATAM liable to Class Members under the Montreal Convention.

(c) Whether LATAM breached its contracts with Class Members when it did not provide flights for which it already received payment.

(d) Whether LATAM's "no-show" policy is unconscionable.

(e) Whether LATAM should be required to obtain consent before cancelling the Class Members' already purchased flights.

(f) Whether LATAM's "no-show" policy is unfair and/or deceptive.

### *Superiority*

38. This class action satisfies the superiority requirement of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy for a variety of reasons, including, without limitation, that it would be an inefficient use of judicial resources to require each putative class member affected by LATAM's actions to bring their own claim. Moreover, the case deals with common issues of law that may be adjudicated uniformly in one single action without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require.

### *Class action under Fed. R. Civ. P. 23(b)(2)*

39. The prerequisites for maintaining a class action under Fed. R. Civ. P. 23(b)(2) also exist because by non-consensually cancelling Class Members' already paid-for flights, LATAM has acted or refused to act on grounds that apply to the entire class, making injunctive and equitable relief appropriate.

40. Specifically, Plaintiff seeks an order declaring that LATAM's "no-show" policy is deceptive, misleading, and that it violates applicable federal and state laws causing damages to Class Members. Plaintiff requests an injunction against LATAM, preventing it from further taking advantage of unsuspecting Class Members through its "no-show" policy.

**COUNT I – DECLARATORY ACTION**
*28 U.S.C. §2201, et seq.*
**(On Behalf of the *Multistate Class*)**

41. Plaintiff incorporates paragraphs 1 through 40 fully in this Count.

42. Plaintiff currently has an actual and justiciable controversy between it, as representative of a class of plaintiffs, and LATAM.

43. Specifically, Plaintiff has a question as to what its rights are vis-à-vis LATAM. Plaintiff believes that LATAM's "no-show" policy is void and unenforceable as a matter of law. Plaintiff believes that LATAM's "no-show" policy is unconscionable and that LATAM should be required to obtain consumers' consent before cancelling flights consumers already paid for, and that they expect to use.

44. Plaintiff's doubts are bona fide and are primarily born out of the losses and waste of money incurred as a result of what it believes is LATAM's conduct or neglect of their responsibility to fulfill its promises to it and other Class Members.

45. LATAM will contend that it disclosed its "no-show" policy, and that the "no-show" policy is enforceable.

46. Because of the diametrically opposed views of the parties, there is an actual, present need for this Court's declaration.

47. The unsettled state of affairs between Class Members and LATAM creates a financial burden on Class Members who purchased (and will continue to purchase) LATAM's flights, unaware of the risks they face in the event they cannot complete one leg of their flights, and LATAM charges them more than the open market to replace one-way flights.

WHEREFORE, based on the allegations on this Count I of this Class Action Complaint, Plaintiff demands a judgment against LATAM declaring:

(a) That LATAM's "no-show" policy is void and unenforceable;

(b) That LATAM has an affirmative duty to request a consumer's consent before cancelling paid trips; and

(c) Any such other and further relief as this Court may deem just and proper.

### COUNT II – VIOLATION OF THE MONTREAL CONVENTION
**(On Behalf of the *Multistate Class*)**

48. Plaintiff incorporates the allegations in paragraphs 1 through 40 fully in this Count.

49. LATAM is a "carrier" within the meaning of the Convention.

50. Under Art. 19 of the Convention, "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers," unless the carrier "took all measures that could reasonably be required to avoid the damage" or it was impossible for it to take such measures.

51. When LATAM cancelled Plaintiff's MIA-LIM flight, despite Plaintiff having warned LATAM that Egusquiza and Guerrero were not going to board the LIM-MIA flight, LATAM violated Art. 19 of the Convention.

52. When LATAM, after learning that Egusquiza and Guerrero were not going to board the LIM-MIA flight, cancelled their MIA-LIM return flights, LATAM caused damages that were easily avoidable.

53. When LATAM cancels flights that consumers already paid for, without obtaining their consent, and leave consumers stranded, scrambling for expensive last-minute flights, LATAM violates Art. 19 of the Convention.

54. It would be very easy for LATAM to request consent from Plaintiff and other Class Members before cancelling their flights and take appropriate measures to avoid unsuspecting consumers being stranded at the airport. For example, LATAM could have called or texted Peschiera, Egusquiza, or Guerrero, and requested consent to cancel their flights.

55. It would be unreasonable to force Class Members to purchase a more expensive replacement flight with LATAM rather than purchasing a more economical option with another airline to replace one leg of a trip in situations where consumers, for one reason or another, cannot board their original flights.

56. LATAM's violation of the Convention caused damages to Plaintiff and other similarly situated Class Members.

WHEREFORE, Plaintiff requests a judgment for statutory damages as prescribed by the Montreal Convention, prejudgment interest, attorney's fees and costs, and any other relief that the Court deems just and equitable.

### COUNT III – UNJUST ENRICHMENT
**(On Behalf of the *Multistate Class*)**

57. Plaintiff incorporates the allegations in paragraphs 1 through 40 fully in this Count.

58. Plaintiff brings this claim on behalf of the *Multistate Class* as there are no true conflicts (case-dispositive differences) among the various States' unjust enrichment laws. *See* **Appendix A**. In the alternative, Plaintiff brings this claim under the laws of the states where Plaintiff and other Class Members reside and/or purchased their tickets.

59. Plaintiff conferred a benefit on LATAM in the form of payment for two roundtrip tickets for the route LIM-MIA-LIM.

60. LATAM knowingly and voluntarily accepted this benefit by collecting payment from Plaintiff as well as every time a class member purchased a roundtrip ticket.

61. LATAM did not provide Class Members all or part of the service they paid for, while keeping Class Members' payments.

62. Moreover, on information and belief, LATAM resold Class Members' flights in the open market and profited twofold or more on seats that belonged to Class Members, who were left

stranded at airports having to scramble for last-minute expensive flights to obtain what LATAM took from them.[6]

63. As a result, LATAM benefited by being unjustly enriched from the payments they received from thousands of consumers, while not providing these consumers with at least one leg of their flights, and instead reselling the seats.

WHEREFORE, Plaintiff requests an order declaring that LATAM was unjustly enriched, for monetary damages, prejudgment interest, attorney's fees and costs, and any other relief that the Court deems just and equitable.

**COUNT IV – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, § 501.201, Fla. Stat. et seq.**
**(On behalf of the *Multistate Class* or in the alternative the *Florida Subclass* only)**

64. Plaintiff incorporates the allegations in paragraphs 1 through 40 fully in this Count.

65. This is an action for LATAM's violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

66. FDUTPA renders unlawful any "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. Under FDUTPA, "trade or commerce" is defined to include the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service." § 501.203(8), Fla. Stat.

67. Plaintiff and other Class Members are consumers within the meaning of FDUTPA.

---

[6] LATAM does not lose any money by flying with Class Members/consumers empty seats because these seats were already paid for. Moreover, in a scenario where consumers do not make it to both legs of their trips, LATAM would spend less fuel because it would be carrying less weight while having been paid for the seat in full.

68. LATAM's actions were unfair and deceptive in that they gouge the price for changing flights in such a way that forces consumers to purchase flights with other airlines when they cannot make one leg of their roundtrip reservation.

69. LATAM's actions were unfair and deceptive in that they resell flights that were already paid for by the Class Members, and that Class Members intended to use.

70. LATAM's actions were unfair and deceptive in that they intentionally do not request a consumer's consent to cancel their flights, so it can then resell Class Members' seats and make twice or more money on the same seat.

71. LATAM's actions were unfair and deceptive in that it is in the best position to obtain a consumer's consent before cancelling and reselling flights already paid for by the Class Members. LATAM, however, has no interest in obtaining consumers' consent, as evidenced by the fact that even when TM Solutions' agents warned LATAM and its agents that they were not going to board the inbound LIM-MIA flights and that it was going to purchase one-way replacement flights for Egusquiza and Guerrero, LATAM still cancelled flights that it knew or should have known Plaintiff intended and needed to use.

72. LATAM's actions violate FDUTPA because it is extremely unfair that Class Members have to pay exorbitant prices for last-minute flights, when they had already paid LATAM for flights, and they did not give LATAM permission to cancel or resell them.

73. A reasonable consumer has a reasonable expectation of having the ability to use return flights even if he or she, for one reason or another, cannot board the original inbound flight.

74. When LATAM, without obtaining a consumer's consent, cancels flights for which it already received full payment, it engages in a practice that is deceptive and unfair.

75. LATAM's acts, as described *supra*, are to be considered unconscionable, deceptive, or unfair acts or practices as defined by FDUTPA.

76. As a direct and proximate cause of LATAM's unlawful acts, Plaintiff and the Florida Subclass Members have been damaged in that they have sustained losses that they would otherwise not have sustained but for LATAM's actions.

WHEREFORE, Plaintiff requests an order for monetary damages for LATAM's violation of FDUTPA, prejudgment interest, attorney's fees and costs pursuant to §§ 501.211(2), Fla. Stat., an injunction against LATAM, and any other relief that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 13, 2020

                Respectfully submitted,

                Eduardo A. Maura, Esq.
                Luis F. Quesada, Esq.
                *Attorneys for Plaintiff*
                **Ayala Law, P.A.**
                1390 Brickell Ave, Ste 335
                Miami, FL 33131
                Telephone: 305-570-2208
                Email: eayala@ayalalawpa.com

                By: */s/ Eduardo A. Maura*
                      Eduardo A. Maura
                      Florida Bar No. 91303

                Jorge Garcia-Menocal, Esq.
                *Attorney for Plaintiff*
                **Garcia Menocal, Pastori & Irias LLP**
                368 Minorca Ave
                Coral Gables, Florida 33134

Telephone: 305-400-9652
Email: jgm@gmilaw.com

By: */s/ Jorge G. Menocal*
Jorge G. Menocal
Florida Bar No. 17990

# Appendix A

**UNJUST ENRICHMENT CLAIMS — STATE BY STATE COMPARISON**

Unjust enrichment is defined as "enrichment that lacks an adequate legal basis; it results from a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights." Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. b (2011).

While the precise language may vary slightly by jurisdiction (see table below), a plaintiff must generally prove three elements to establish a claim for unjust enrichment: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had an appreciation or knowledge of the benefit; and (3) the defendant accepted or retained the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. *Id.*, cmt. d.

| State | Elements of Unjust Enrichment Claim |
|---|---|
| Florida | The elements of an unjust enrichment claim are (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1242 (Fla. 2004). |
| California | The elements of a claim of unjust enrichment are (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense. *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017). |
| Massachusetts | In order to state a claim for unjust enrichment a plaintiff must prove (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable. *Stevens v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2008). |
| New York | In order to adequately plead an unjust enrichment claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered. *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516, 973 N.E.2d 743, 746 (2012). |
| Washington, D.C. | The elements of an unjust enrichment claim are (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *Mazor v. Farrell*, 186 A.3d 829, 833 (D.C. App. 2018). |